IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| JACQUELINE L. MITCHELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. G-13-429 |
| | § | |
| CAROLYN W. COLVIN, Commissioner of the Social Security Administration, | § | |
| | § | |
| | § | |
| Defendant. | § | |

**OPINION AND ORDER**

Before the Court, with the consent of the parties, is Plaintiff's Motion for Summary Judgment (Dkt. No. 11) and Defendant's cross Motion for Summary Judgment. (Dkt. No. 12). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, the Court concludes that Defendant's Motion for Summary Judgment is granted in part and denied in part, that Plaintiff's Motion for Summary Judgment is denied in part and granted in part, and that this matter is remanded to the Commissioner of the Social Security Administration for further proceedings.

## I. BACKGROUND

### A. Factual Background

On August 17, 2010, Plaintiff Jacqueline L. Mitchell (Mitchell) filed an application with the Social Security Administration (SSA), seeking disability insurance benefits (DIB) under Title

II.[1] (Transcript (Tr.) 161-168, 169-173). In her application, Mitchell alleged that her disability began on July 5, 2010, and that it was due to "diarrhea." (Tr. 194). Mitchell later amended her application to reflect that her disability was due to collagenous colitis (Tr. 217) and chronic sinus problems. (Tr. 227).

A review of the medical records submitted in connection with Mitchell's administrative hearing reflect that Mitchell previously experienced recurring episodes of diarrhea in or around July 2007,[2] however, her condition ultimately resolved and she remained symptom-free until mid-2010.[3] In July 2010, Mitchell began experiencing abdominal bloating and persistent diarrhea that appeared to coincide with swimming in the Wisconsin Dells. (Tr. 213, 284, 336-389). After failing to obtain relief with any over–the-counter medication, Mitchell sought medical care for her condition. Although her initial physical exam was essentially normal, the doctor diagnosed her with diarrhea acute on chronic concerns and referred her to a gastroenterologist. (Tr. 267, 284-285).

Mitchell saw the gastroenterologist in mid-August 2010, due to persistent bowel problems. (Tr. 267-269). Mitchell's physical examination was essentially normal, except that she was found to have minimal tenderness to palpation throughout her abdomen. (Tr. 268). Her stool cultures were negative and her helicobacter pylori was normal. (Tr. 268). The doctor diagnosed Mitchell with abdominal bloating and diarrhea and he ordered a bacterial overgrowth test and another stool culture to check for different parasites. In terms of treatment, the doctor instructed Mitchell to

---

[1] Mitchell also submitted a claim for supplement security income (SSI), but it was denied because she exceeded the asset/income threshold. (Tr. 104).

[2] According to the records, Mitchell lived in and received this treatment in Texas.

[3] Mitchell lived in Wisconsin when her condition recurred in mid-2010.

increase the dosage of Imodium, begin a "bowel regimen including Benefiber," initiate probiotics, and increase her water intake and exercise. (Tr. 269).

Mitchell continued to experience bloating and diarrhea and the records reflect that from November to December 2010, she sought treatment on three separate occasions. (Tr. 265, 280-281). During one of the visits, Mitchell explained that she was using a probiotic, along with other medication,[4] and while she had seen some improvement in her stools and abdominal cramping, she was still experiencing 8-9 bowel movements per day that were watery in nature. (Tr. 265). Mitchell's physical examination was normal. Her stool culture and the bacterial overgrowth test were also normal. (Tr. 281-282). According to the notes, the doctor recommended that Mitchell undergo additional diagnostic tests such as a CT scan, colonoscopy, endoscopy, and that other studies be performed, however, the notes reflect that Mitchell was "not interested" in most of the diagnostic tests because she had no insurance and, being out of a job for six months, she would not be able to afford the tests. (Tr. 265). The doctor diagnosed Mitchell with diarrhea and he encouraged her to try Lomotil[5] and Imodium to see if she was able to obtain some relief with these medications. (Tr. 265, 282). During an unrelated visit to the clinic in February 2011,[6] the notes reflect that Mitchell reported that she had seen some improvement in her diarrhea on a new

---

[4] Mitchell reported that she previously obtained Rifaximin outside of the country, which had improved her abdominal cramping, and that she had obtained and was currently taking Azitromycin, which she obtained from Russia. Both medications are antibiotics that are used to treat drug-resistant baceria and reduce its development. *See* http://www.rxlist.com.

[5] Lomotil, which is also known as diphenoxylate and atropine, is indicated as adjunctive therapy in the management of diarrhea. http://www.rxlist.com/lomotil-drug.htm.

[6] Mitchell was at the clinic to have a mole on her back evaluated.

probiotic, but she requested to be tested for celiac disease.[7] (Tr. 277, 278; 287-289).

In early April 2011, Mitchell began seeing a new doctor at Affinity health clinic for her bowel problems. (Tr. 313). According to Dr. Alam's notes from May 3, 2011, Mitchell reported that she was continuing to have abdominal complaints and persistent diarrhea. Mitchell explained to Dr. Alam that on a bad day she would experience approximately 10 loose stools and on a good day she would experience 6 semi-formed stools. (Tr. 310). She also explained that she had tried various remedies without lasting relief. Dr. Alam ordered a colonoscopy and, based on the results, Mitchell was diagnosed as having collagenous colitis.[8] (Tr. 308, 311, 324-326).

In late May 2011, Mitchell returned to see Dr. Alam and reported that she was experiencing 6 to 14 loose bowel movements per day. (Tr. 308). An abdominal ultrasound was performed and ruled-out the possibility of ascites.[9] (Tr. 322, 331). After discussing all the prior treatments that had been attempted to alleviate her condition,[10] Dr. Alam determined that it was

---

[7] Celiac disease is a digestive and autoimmune disorder that occurs when gluten is ingested and the body mounts an immune response that attacks the small intestine. https://celiac.org/celiac-disease/what-is-celiac-disease.

[8] Collagenous colitis is a clinical and pathologic syndrome representing a form of microscopic colitis that affects the large intestine. The disorder usually presents in middle-aged patients in the fifth or sixth decade of life and primarily affects women. Most patients present with complaints of chronic, watery, noninfectious diarrhea, and abdominal pain. The main symptom in collagenous colitis is chronic, watery diarrhea . Patients with this form of colitis will normally describe 5–10 watery bowel movements per day persisting for an average of five years, but in some cases as long as 20 years. Diarrhea is usually accompanied by cramps and diffuse abdominal pain, which rarely occurs at night. These patients are frequently misdiagnosed as having irritable bowel syndrome. www.hopkinsmedicine.org/gastroenterology_hepatology/_pdfs/small_large_intestine/collagenous_lymphocytic_colitis.pdf.

[9] Ascites is an abnormal buildup of fluid in the abdomen that causes swelling. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0022961/.

[10] Mitchell tried several over-the-counter medications. In addition, Mitchell explained that she was previously placed on mesalamine compounds to treat a similar situation years ago, but it proved unsuccessful. She was also placed on Asacol, but it did not help because the pills were excreted in her bowel movements.

prudent to start Mitchell on a round of Entocort.[11] He directed Mitchell to initially take Entocort at the highest dosage (*i.e.*, 9 mg) for several weeks and then to slowly taper off the medication completely. (Tr. 308).

When Mitchell returned to Dr. Alam in mid-July, she reported that the Entocort worked well at the maximum dose, however, when she decreased the dosage as he had directed, the severity of her bowel problems recurred. (Tr. 306). According to the notes, Mitchell also reported continued right upper quadrant abdominal pain that she explained was made worse after eating. Mitchell's physical exam proved unremarkable. Dr. Alam instructed Mitchell to resume taking Entocort at the highest dosage level (9 mg) for another three weeks, but to taper off the medication (*i.e.*, a 6mg dose for three weeks, a 3 mg dose for six weeks) and then discontinue the drug because he cautioned that the long-term side effects of Entocort were not acceptable. (Tr. 306). Along with the Entocort, Dr. Alam placed Mitchell on a high dose of Asacol[12] (*i.e.*, 800mg, three times per day). (Tr. 306).

When Mitchell saw a clinic nurse on September 22, 2011, to obtain a prescription refill on other medication, she explained that she was still seeing Dr. Alam for the treatment of her colitis and that she was currently taking 3 mg of Entocort three times a day,[13] along with 800 mg

---

[11] Entocort (or the generic name budesonide) is a systematic glucocorticosteroid that is indicated for the treatment of mild to moderate active Crohn's disease involving the ileum and/or the ascending colon for up to 3 months. The drug decreases the body's natural defense response or immune response. http://www.rxlist.com/entocort-drug/indications-dosage.htm.

[12] Asacol or mesalamine is a delayed-release prescription drug that is indicated for the treatment of mildly to moderately active ulcerative colitis. The maximum daily dosage for an individual over 54 years old is 2.4 mg and the recommended duration is noted to be 6 weeks. http://www.rxlist.com/asacol-drug/indications-dosage.htm.

[13] The notes reflect that Mitchell was taking 3 mg of the Entocort, three times a day. Although unclear, this would appear to suggest that she was still taking the highest dosage of the drug.

of Asacol three times a day. (Tr. 396-397). According to the notes, Mitchell reported that at this dosage level she was only having about 2 bowel movements per day, that there is no blood in her stool, that she was having no abdominal pain and that she was doing better overall. (Tr. 396). Mitchell was advised to continue her care with Dr. Alam. (Tr. 397). Similarly, when Mitchell was seen by an ENT in October and November 2011, due to chronic rhinitis, she relayed to the ENT that she had colitis and that she was currently under an other doctor's care for treatment. (Tr. 391, 393-394).

At some point during this time frame, Mitchell returned to live in Texas. The records reflect that Mitchell saw Dr. Warneke, the gastroenterologist who treated her in 2007/2008, on January 3, 2012. (Tr. 404; 406-429). Dr. Warneke's notes from the office visit reflect that Mitchell was diagnosed with collagenous colitis in May 2011 after undergoing a colonoscopy; that she had been treated with Asacol 800 mg three times a day, along with three separate "rounds" of Entocort; and that Mitchell was frustrated that the "[t]he diarrhea remitted with Entocort only to return upon discontinuation." (Tr. 404). Mitchell's physical examination was unremarkable. (Tr. 404). According to the notes, Dr. Warneke diagnosed Mitchell with "microscopic colitis" and he discussed, at length, the "chronic nature of [her] disease and the need for 'lifelong' anti-inflammatory therapy." (Tr. 404-405). Dr. Warneke instructed Mitchell to continue taking the same dosage of Asacol, however, instead of putting her back on the glucocorticosteroid Entocort, he started her on Questran[14] and advised her to follow-up in three weeks to let him know how she was doing on the new medication. (Tr. 405). Mitchell contacted the doctor's office approximately

[14] Questran is indicated for the treatment of high cholesterol, however, it is commonly known to slow down the bowels and cause constipation. http://www.rxlist.com/questran-drug/indications-dosage.htm.

two weeks later and reported that while her stool had gone from watery to loose on Questran, she was not tolerating the drug very well and that, even at a reduced amount, she was experiencing significant bloating and gas. (Tr. 400). Due to her adverse reaction to Questran, Dr. Warneke restarted Mitchell back on Entocort. (Tr. 400).

On January 20, 2012, Mitchell began seeing[15] Dr. William Obenour, Jr., M.D. in Houston. (Tr. 439).[16] The doctor's notes from her February 20, 2012, visit reflect that she was currently taking a 6 mg dose of Entocort, but that she didn't feel like that dose was very effective. (Tr. 436). Dr. Obenour instructed Mitchell to continue taking 6 mg of Entocort for two weeks and, in addition to that drug, he placed her on a 15 mg dose of Methotrexate[17] for four weeks. (Tr. 438). When Mitchell returned to see Dr. Obenour on March 16, 2012, she continued to complain of abdominal bloating and cramping on the medications. (Tr. 434). Dr. Obenour instructed Mitchell to reduce the Entocort to a 3mg dose and he increased her dosage of the Methotrexate. (Tr. 434).

**B. Procedural History**

Upon this record, Mitchell's DIB claim was denied initially and on reconsideration.

---

[15] The notes reflect that Mitchell was a prior patient who Dr. Obenour had last seen in 1992. (Tr. 439, 442, 447-462).

[16] The administrative record reflects that on or around January 13, 2012, an individual named Judith Searan (presumably, a friend to Mitchell) emailed Dr. Bill Obenour, M.D.asking him if he could see Mitchell on an "emergency basis" next week. (Tr. 443). In the email, Judith Searan informed the doctor that Mitchell had borrowed enough money ($250) to go see Dr. Dobbs, but that she was unable to get in to see him because he had no opening for several weeks. Judith Searan also informed Dr. Obenour in the email that Mitchell "has no insurance and can't work." (Tr. 443). Dr. Obenour agreed to see Mitchell that week. (Tr. 443).

[17] Methotrexate is a immune-suppressant drug that is used to treat some cancers, severe skin diseases and forms of rheumatoid arthritis that don't respond well to full doses of non-steroidal anti-inflammatory agents. http://www.rxlist.com/ trexall-drug.htm.

Mitchell requested a hearing before an Administrative Law Judge's (ALJ). Following the May 31, 2012 hearing, the ALJ determined that 61 year old Mitchell was not disabled. (Tr. 24-96, 13-17, 214). In his decision dated August 29, 2012, the ALJ made the initial determination that Mitchell met the "insured status requirements of the Social Security Act through September 15, 2015" and that she had "not engaged in substantial gainful activity since July 5, 2010, the alleged onset date." (Tr. 13). At step 2, the ALJ found that Mitchell had a severe impairment, which was collagenous colitis. (Tr. 13). Proceeding on, the ALJ found at step 3 that Mitchell did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14). The ALJ then determined that Mitchell had "the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except: [she] require[d] ready access to bathroom facilities." (Tr. 14). Finally, at step 4, the ALJ determined that Mitchell was "capable of performing past relevant work as a registered nurse"[18] and that "[t]his work does not require the performance of work-related activities precluded by [her] residual functional capacity." (Tr. 16).[19] The ALJ, therefore, concluded that Mitchell had "not been under a disability, as defined in the Social Security Act, from July 5, 2010, through the date of this decision." (Tr. 17). Mitchell requested review of the decision by the Appeals Council and submitted additional documents for consideration. Nonetheless, the Appeals Council denied Mitchell's request on September 26, 2013. Accordingly, the ALJ's decision being the final decision of the Commissioner. (Tr. 1-5).

---

[18] Mitchell was a registered nurse and she worked in that capacity for 20 years. (Tr. 33-34).

[19] Because the ALJ found that Mitchell could perform her past relevant work, he did not proceed on to step five of the sequential evaluation process. *See Leggett v. Chater*, 67 F.3d 558, 563 (5th Cir.1995) (recognizing that if, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends).

Mitchell then filed this civil action, seeking judicial review of the Commissioner's decision. (Dkt. No. 1). After the administrative record was filed (Dkt. No. 8), both sides moved for summary judgment. (Dkt. Nos. 11, 12). The Motions are now ripe for adjudication.

## II. LEGAL STANDARD

Judicial review of a denial of disability benefits "is limited to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir.1999); 42 U.S.C. § 405(g). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir.1995). In applying the substantial evidence standard, the reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather, its role is to scrutinize the administrative record to determine whether substantial evidence is present. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir.1988). "The Commissioner, not the court, has the duty to weigh the evidence, resolve material conflicts in the evidence, and make credibility choices." *Carrier v. Sullivan*, 944 F.2d 105, 109 (5th Cir.1991).

## III. ALLEGED POINTS OR ERROR

Mitchell presents numerous grounds of error in this case which are delineated as follows:

> (1) the ALJ abused his discretion by cherry-picking the evidence in a misleading manner and by making inferences contradicted by the record in order to support his assessment of her residual functional capacity;

(2) the ALJ summarily rejected evidence favorable to her without conducting a meaningful examination of the evidence or explaining why he was rejecting the evidence;

(3) the ALJ improperly discounted her credibility on the basis that she was noncompliant with prescribed treatment;

(4) the ALJ failed to consider and/or discuss the side-effects that her multiple medications, including her immunosuppressant, would have on her ability to work as required by SSR 96-7p and SSR 96-8p;

(5) the ALJ failed to give controlling weight to the opinion of the treating physician, to obtain a more detailed report from the treating physician, and to consider and discuss each of the factors in assessing a treating physician's opinion before rejecting it;

(6) the ALJ failed to obtain an updated medical opinion from the medical expert regarding medical equivalency concerning her combined impairments and failed to consult a medical expert concerning her RFC;

(7) the ALJ failed to properly develop the case by obtaining an updated medical expert;

(8) the ALJ improperly concluded that her allegations of non-exertional symptoms were exaggerated based on her limited activities of daily living and erred in finding that she was capable of performing at the medium exertional level based on her limited activities of daily living;

(9) the ALJ failed to find her cervical stenosis was not severe and he further erred in failing to conduct a meaningful examination of the evidence and/or explain why he was rejecting it;

(10) the ALJ erred in not determining whether she could maintain employment;

(11) the ALJ erred in finding that she did not meet Listing 5.06; and

(12) that new evidence received after the hearing would have materially changed the outcome of the hearing had it been presented to the ALJ.

(Dkt. No. 11). The Commissioner, in contrast, contends that substantial evidence exists in the record to support the ALJ's decision, that the decision comports with applicable law, that any

deficiency in the ALJ's written decision constitutes harmless error, and that the decision should be affirmed. (Tr. 12).

## IV. DISCUSSION

The Court addresses the issues raised in this case, albeit out of turn, through the framework the five-step sequential process.[20] When determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnoses and expert opinions of treating physicians on subsidiary questions of fact; (3) the subjective evidence of pain and disability as testified to by the claimant; and (4) the claimant's educational background, work history and present age. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

### A. The Step 2 Determination

The ALJ determined at Step 2 that Mitchell had collagenous colitis which was a "severe" impairment. (Tr. 13). In her ninth point of error, Mitchell argues that the ALJ erred when he failed to include as "severe" the "mild to moderate" cervical canal stenosis and mild to severe cervical neuroforaminal stenosis that was found after an MRI was performed in 2007. (Dkt. No. 11 at 21). The ALJ did not error in this regard. Despite the 2007 MRI findings, Mitchell does not refute the evidence that clearly reflects that Mitchell worked for years *after* the MRI study was performed. (Tr. 161-165). *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (working for several years with alleged impairment cuts against claim of disability). Moreover, Mitchell

---

[20] The Social Security Administration uses a well-established five-step process to determine whether an individual is disabled. See 20 C.F.R. § 404.1520(a)(4). The steps must be followed sequentially and, if at any step the Commissioner determines that the claimant is disabled or not disabled, the evaluation ends. *Id.*

does not refute that she did not claim a cervical spine impairment in her application for disability (Tr. 194), nor is there evidence of any complaints or treatment during the relevant time. (Tr. 265-468). Finally, during the hearing, despite apparent prompting from her attorney, Mitchell testified that she had no limitations resulting from the cervical stenosis. (Tr. 77-78). Because the ALJ did not error in making his Step 2 determination, the Court concludes that the Commissioner is entitled to summary judgment as to this point of error.

**B. The Step 3 Determination**

At Step 3, the ALJ found that Mitchell did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the regulations. (Tr. 14). In her twelfth point of error, Mitchell argues that the ALJ erred in finding that she did not meet Listing 5.06. (Dkt. No. 11 at 22-25). In support of her argument, Mitchell insists that the ALJ erroneously applied an outdated listing for 5.06 and, unlike the predecessor listing, the modified listing only required that she establish the severity criteria (*i.e.*, the "A" or "B") for the "operative" diagnostic criteria. (Dkt. No. 11 at 22-25). Mitchell points to no authority, however, that supports her construction that, as modified in 2007, the listing does not require claimants to establish the severity criteria to each of the listed diagnostic criteria (*i.e.*, "documented by endoscopy, biopsy, [or] appropriate medically acceptable imaging." (Dkt. No. 11 at 24). Nor is the Court, having considered the listing and the case law interpreting it, persuaded by any such view. *See Singleton v. Colvin*, No. 3:12-CV-00821-BF, 2013 WL 1562867, at *8 (N.D.Tex. 2013) (recognizing that to meet Listing 5.06, a claimant must still meet the severity criteria outlined in (B)); *Guillot v. Astrue*, No. 10-01447, 2011 WL 4018681, at *13-14 (E.D.La. June 22, 2011) (recognizing that, in addition to a diagnosis by a colonoscopy, the

claimant must also meet the additional criteria under (A) or (B)); *see also*, *Parker v. Comm'r, Soc. Sec. Admin.*, Civ. No. SAG-12-2964, 2013 WL 5376560, at *1-2 (D.Md. Sept. 23, 2013) (same); *Henry v. Astrue*, No. 10-CV-109 (LEK/VEB), 2012 WL 1657186, at *6-8 (N.D.N.Y. March 22, 2012) (same); *Phelps v. Astrue*, No. 10-cv-240-SM, 2011 WL 2669637, at *4 (D.N.H. July 7, 2011) (same). The Court, therefore, concludes that the ALJ properly determined that Mitchell's impairment did not meet or equal the listing and, as such, her impairment cannot be considered *per se* disabled under Step 3 of the inquiry. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir.1994) (recognizing that the burden of proof is on the claimant to establish that she meets a listing, and that burden is "demanding and stringent"); *see generally*, *Leggett*, 67 F.3d at 564 (the claimant bears the burden of proof during step one through step four of the sequential analysis). The Court finds that the ALJ did not error at Step 3 and, therefore, concludes that the Commissioner is entitled to summary judgment on this point of error.

**C. The RFC Determination**

Before proceeding on to Step 4, the ALJ was required to assess Mitchell's residual functional capacity ("RFC").[21] As defined in the regulations, RFC is defined as the most an individual can still do despite her limitations. 20 C.F.R. § 404.1545; SSR 96-8p. The responsibility to determine the claimant's RFC belongs to the ALJ. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). The ALJ's determination is reached through a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87

[21] If the impairment is severe at step 2, but does not meet or equal a listed medical impairment at step 3, then the Commissioner must conduct a residual functional capacity assessment before proceeding on to the remaining steps. See 20 C.F.R. § 404.1520(a)(4).

(5th Cir. 1988); *see also*, SSR 96-8p, 1996 WL 374184 (July 2, 1996). In making this determination, the ALJ must consider all the record evidence and cannot "pick and choose" only the evidence that supports his determination. 20 C.F.R. § 404.1545; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

In the present case, the ALJ determined that Mitchell had the RFC to perform medium work as defined in 20 CFR § 404.1567(c), except that she required ready access to bathroom facilities. (Tr. 14). Mitchell challenges the ALJ's RFC determination on several grounds, however, her initial contention - and the one from which other issues flow - is that the ALJ abused his discretion by "cherry-picking" the evidence in a misleading manner and by making inferences contradicted by the record in order to support his assessment of her residual functional capacity. Mitchell points to numerous instances in the decision where the ALJ either misconstrued the evidence or made inferences contradicted by the record. (Dkt. No. 11 at 4-11).

The Court, having reviewed the ALJ's decision against the backdrop of the objective medical evidence, concludes that substantial evidence does not support his RFC determination. Instead, as urged by Mitchell, it is evident that the ALJ engaged in impermissible picking and choosing of medical records and that he also mis-characterized both the medical records and Mitchell's testimony. *Loza*, 219 F.3d at 393 ("The ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position"). For example, in his decision the ALJ explained that while Mitchell's doctor recommended diagnostic tests be performed, she was "not interested" in having them done. (Tr. 15). He also appears to have re-emphasized this by stating that only later did Mitchell "***finally***" consent to and have the colonoscopy done in May 2011, and this testing revealed that she had collagenous colitis. (Tr.

15). The manner in which the ALJ characterized this evidence is misleading because he failed to explain why Mitchell was not "interested" in having the diagnostic tests performed. As is clearly reflected in the medical records, and as confirmed by Mitchell in her testimony, she declined the additional diagnostic tests because she had no health insurance and, being without income from work for several months, her doctor's notes reflect that she would not be able to afford the tests. (Tr. 265).

The ALJ also mis-characterized the evidence by suggesting in his decision that Mitchell was voluntarily non-compliant with taking her medication, Entocort,[22] when the records clearly reflect that Mitchell did not "stop" taking Entocort, but she was merely following her doctors orders to taper off the medication (*i.e.*, 9 mg dose for 4 weeks, 6 mg does for 4 weeks, and then 3 mg dose for 4 weeks). The records further reflect that Mitchell's doctor instructed her to "restart" Entocort only after attempts to try another medication (*i.e.*, Questran) were not successful in controlling her symptoms

In addition, the ALJ characterized the drug Entocort (Budesonide) as being a virtual panacea for Mitchell's bowel troubles. This too appears misleading. The medical record documents that Mitchell reported that she had relief with Entocort at the highest dosage, but when she lowered the dosage – as she was directed to do by her doctor – she suffered a relapse. (Tr. 306, 404, 436). The ALJ appears to ignore this evidence, as well as the evidence that supports that Entocort is not intended for continuous and ongoing use (*i.e.*, her doctors documented that continuous and ongoing use of Entocort is "unacceptable"). (Tr. 306, 404-405). Instead, the

---

[22] In his decision the ALJ reasoned "when [Mitchell] takes her medications, her diarrhea clearly improves and she is under significant control." (Tr. 15).

evidence reflects repeated attempts, without success, by her doctors to find a different medication to control her symptoms.

Because the ALJ mis-characterized Mitchell's testimony and the medical records and engaged in inappropriate picking and choosing of conclusions/evidence from the medical records to find that medication controlled Mitchell's bowel problems when she continued taking the medication, substantial evidence does not support his finding. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council"). Although acknowledging that the ALJ mis-characterized the evidence, the Commissioner insists that the errors were harmless and, as such, remand is not warranted. (Dkt. No. 12 at 4). The Court cannot agree. The manner in which the ALJ mis-characterized the evidence appears to have rippled through the remainder of the ALJ's conclusions. For example, the ALJ's mis-characterization of the evidence appears to have clearly effected his decision to given little weight to her treating doctor's opinion concerning her RFC[23] and, to an unknown extent, to his credibility determination.[24] Because it cannot be determined from the record whether the ALJ's RFC determination is factually and legally supportable, the Court concludes that remand is appropriate.[25] Finally, insofar as remand is warranted at this stage

[23] The ALJ concluded that Dr. Obenour's opinion was entitled to little weight because he stated that the opinion was "not consistent with the treating records and other records in the file as described above which show that the claimant's colitis is, in fact, largely controlled with Entocort and does not have a disabling impact on her." (Tr. 16).

[24] The fact that Mitchell could not initially afford the diagnostic tests *or* that she took Entocort as prescribed by her treating physicians should not negatively reflect upon her credibility. To the extent the ALJ's analysis of Mitchell's credibility hinged on either, the ALJ's analysis was in error.

[25] The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits. If the ALJ does not satisfy his duty, his decision is not substantially justified. *Boyd*, 239 F.3d at 708 (citing to *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)).

in the sequential process, the Court need not address Mitchell's remaining claims as she can raise those issues before the ALJ on remand. 20 C.F.R. § 404.983 (providing that when a case is remanded from federal court, the ALJ may consider any issues relating to the claim).

## CONCLUSION

Considering the record as a whole, this Court concludes that proper legal standards were not adhered to and the Commissioner's decision is not supported by substantial evidence. The Court, therefore, concludes that as discussed above the Defendant's Motion for Summary Judgment (Dkt. No. 12) is **GRANTED IN PART** and **DENIED IN PART**; that Plaintiff's Motion for Summary Judgment (Dkt. No. 11) is **DENIED IN PART** and **GRANTED IN PART**; and that this action is **REMANDED** to the Social Security Administration pursuant to Sentence 4 of 42 U.S.C. § 405(g), for further proceedings consistent with the determinations made herein.

**DONE** at Galveston, Texas, this 13th day of October, 2015.

JOHN R. FROESCHNER
UNITED STATES MAGISTRATE JUDGE